Jonathan S. Henes, P.C.
Joshua A. Sussberg, P.C.
George Klidonas
Natasha Hwangpo
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
601 Lexington Avenue
New York, New York 10022
Telephone:     (212) 446-4800
Facsimile:      (212) 446-4900

James H.M. Sprayregen, P.C.
A. Katrine Jakola, P.C. (admitted *pro hac vice*)
Christina Lynn Briesacher (admitted *pro hac vice*)
Melissa N. Koss
Gregory F. Pesce (admitted *pro hac vice*)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
300 North LaSalle Street
Chicago, Illinois 60654
Telephone:     (312) 862-2000
Facsimile:      (312) 862-2200

*Proposed Counsel to Cenveo, Inc., et al.*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| CENVEO, INC., *et al.*,[1] | ) | Case No. 18-22178 (RDD) |
| | ) | |
| Debtors. | ) | (Jointly Administered) |
| | ) | |

**OBJECTION OF CENVEO, INC. *ET AL.*,**
**TO MOTION OF BRIGADE CAPITAL MANAGEMENT LP**
**FOR THE APPOINTMENT OF AN EXAMINER PURSUANT TO 11 U.S.C §1104(c)**

Cenveo, Inc. and the other above-captioned debtors and debtors in possession (collectively,

"Cenveo") respectfully submit this objection (this "Objection") to the *Motion of Brigade Capital*

*Management LP for The Appointment of an Examiner Pursuant to 11 U.S.C §1104(c)* filed by

Brigade Capital Management LP ("Brigade") [Docket No. 76] (the "Examiner Motion").

---

[1]    The last four digits of Cenveo, Inc.'s tax identification number are 0533. Due to the large number of debtor entities in these chapter 11 cases, which cases are being jointly administered for procedural purposes, a complete list of the debtor entities and the last four digits of their federal tax identification numbers is not provided herein. A complete list of such information may be obtained on the website of Cenveo's proposed claims and noticing agent at https://cases.primeclerk.com/cenveo. The location of Cenveo's service address for purposes of these chapter 11 cases is: 777 Westchester Avenue, Suite 111, White Plains, New York 10604.

## Overview

1.      In the weeks leading up to and since the commencement of these chapter 11 cases, Cenveo has worked diligently to engage with its major creditors and other constituencies— including Brigade—to pursue a reorganization strategy designed to maximize value for all stakeholders.[2]  As Cenveo approached a potential chapter 11 filing, the company focused its efforts on negotiating a DIP facility that would provide the company with the liquidity it would need to stabilize operations and maintain "business as usual" in the event of a filing.  (Zameli Decl. ¶ 5)  During December 2017 and January 2018, Cenveo's management team and advisors regularly met and communicated with representatives of both a group of the majority of first lien noteholders (the "First Lien Noteholder Group") and with Brigade, among others, to discuss terms of a potential DIP facility, as well as a restructuring support agreement.  (*Id.*)

2.      Regrettably, throughout this process, Brigade and its advisors repeatedly stated to Cenveo's management team and advisors that if Cenveo did not find a way to get Brigade the recovery on its second lien that it desired, then Brigade would change its stance and embroil the company in costly litigation.  (Zameli Decl. ¶ 6)  For example, at a January 25, 2018 meeting at Kirkland & Ellis's New York offices, Cenveo's management team and advisors met with Brigade's principals and advisors to present the company's updated business plan and discuss a potential restructuring deal.  (*Id.*)  At the conclusion of the meeting, one of Brigade's professionals explained, in front of the entire room, that Brigade would dig under every rock to find "dirt" on

---

[2]      Cenveo, at Brigade's request, prior to the Commencement Date paid Brigade's professionals to engage Cenveo on the terms of a restructuring plan.  In addition, to facilitate principal-to-principal discussions, Cenveo agreed that it would provide directly to Brigade, material, non-public information, including business plans and proposals.  In connection therewith, Brigade negotiated with Cenveo over a "cleansing package," *i.e.*, the information that would be made public so that Brigade would be free to trade again if it so desired.  Consequently, on February 2, 2018, Cenveo filed an 8-K, which attached the material, non-public information, and which Brigade attached as an exhibit to its motion.

the Burton family and use it against the company if Cenveo did not deliver a second lien recovery that was acceptable to Brigade.  (*Id.*)  Brigade made similar statements to members of Cenveo's management team on other occasions.  (*Id.*)

3.        Despite Brigade's statements, Cenveo continued to communicate with Brigade—both directly and through its professionals—to try to reach an agreement on a potential DIP and restructuring deal.  (Zameli Decl. ¶ 7)  As the parties discussed the leadership of reorganized Cenveo, it became apparent that Brigade itself did not believe that the Burtons had actually engaged in any wrongdoing.  In that regard, on January 29, 2018—just four days before filing its "preliminary objection" and two weeks before filing its Examiner Motion accusing the Burtons of "potential corporate fraud, misconduct, and/or mismanagement"—Brigade sent a proposal for a chapter 11 plan to Cenveo.  (*See* Zensky Decl. at ¶ 24, Ex. 22)  Notably, Brigade's plan term sheet proposed that both Mr. Robert Burton Sr. (the current chief executive officer of Cenveo) and Mr. Robert Burton Jr. (the current President of Cenveo) would serve as two of the members of the board of reorganized Cenveo.

4.        Discussions with Brigade around a potential plan continued through January 30, 2018—three days before Cenveo commenced these chapter 11 cases.  (Zameli Decl. ¶ 8) Ultimately, based on the dynamics of the negotiations with Brigade and the First Lien Noteholder Group, Cenveo and Brigade could not reach an agreement.  (*Id.*)  Cenveo ultimately agreed to a DIP facility and entered into the Restructuring Support Agreement, dated as of February 1, 2018 (the "RSA"), with the First Lien Noteholder Group.[3]  (Zameli Decl. ¶ 8)

5.        In response and true to its word, Brigade publicly hurled accusations of misconduct at Mr. Burton Sr., Mr. Burton Jr., and other members of Cenveo's board.  Within hours of Cenveo's

---

[3]    *See* Zensky Decl. at ¶ 24, Ex. 22.

chapter 11 filing on February 2 (the "Commencement Date"), Brigade filed a "statement and preliminary objection," voicing "concerns about whether there have been inappropriate insider transactions, breach of fiduciary duties or actionable negligence."[4]  (Brigade St. at ¶ 2)  As promised, Brigade directed these allegations at the Burton family, observing in the next breath that:  "The Debtors have long been controlled by the Burton family. Indeed, as of the commencement of these chapter 11 cases, at least two members of the Burton family are members of the Debtors' board of directors, and three members of the Burton family serve in senior management positions at the Debtors." (Id.)[5]  Remarkably, within just four days' time, Brigade went from respecting the Burtons enough to want them to continue on the board of reorganized Cenveo to portraying them as poor stewards conspiring with others to waste corporate assets.

6.      Just 10 days after the Commencement Date, and before the Official Committee of Unsecured Creditors (the "Committee") had even been formed, and despite the Bankruptcy Court's suggestion at the first day hearing that Brigade engage in discussions rather than seek the appointment of an examiner in the early stages of these chapter 11 cases, Brigade filed its Examiner Motion—a pleading riddled with irresponsible and unfounded allegations and inappropriate

---

[4]    Notably, in its *Statement in Connection with First Day Relief and Preliminary Objection to the Motion of Cenveo, Inc. et al., for Entry of Interim and Final Orders Pursuant to 11 U.S.C. §§ 105, 361, 362, 363, 364, 503, and 507 (I) Authorizing the Debtors to Obtain Senior Secured Priming Superpriority Postpetition Financing, (II) Granting Liens and Superpriority Administrative Expense Claims, (III) Authorizing Use of Cash Collateral, (IV) Granting Adequate Protection, (V) Modifying the Automatic Stay, (VI) Scheduling a Final Hearing, and (VII) Granting Related Relief* [Docket No. 24], Brigade states that it "is prepared to engage in good faith negotiations with Cenveo and other stakeholders to address these concerns, in an attempt to reach a consensual resolution in these chapter 11 cases.  At present, however, it appears likely that these concerns and the need for an investigation in these matters will cause these chapter 11 cases to be contentious and protracted as a result of the first day pleadings and Brigade believes it is important that the Bankruptcy Court and all parties in interest have notice this fact." *Id.* at ¶ 1.  However, the current contentiousness and protractedness is completely caused by Brigade.  Cenveo believes that talking and negotiating is in the best interest of its business and these chapter 11 cases.

[5]    As stated above, the two members of the board were the two members Brigade proposed only four days prior to the Commencement Date, as discussed in Brigade's term sheet proposal, which is attached as Exhibit 22 to its motion.

conjecture.  In its Examiner Motion, Brigade launched a number of baseless and grave accusations against individual members of Cenveo's board and management—charging these individuals (including, incredibly, the President of the University of Connecticut and the founder of a school for children with learning disabilities) of "potential corporate fraud." (Examiner Mot. at 6-7, 13) In particular, Brigade accuses Cenveo's "controlling shareholders, officers, and/or directors" of engaging in three types of alleged "misconduct"—claiming that they:  "(i) have been involved in insider/related party transactions, (ii) have received exorbitant, non-market compensation and benefits, and (iii) have engaged in questionable negotiations culminating in the proposed [RSA]." (Examiner Mot. at ¶ 1)  Of course, it is accurate that Cenveo entered into related party transactions, compensated management, and entered into the RSA, all of which was publicly disclosed.  But, aside from rank speculation, Brigade's purported "evidence" to support its allegations of potential "misconduct"—as Brigade admits—consists solely of the publicly available information that Cenveo itself disclosed in regulatory filings every year since 2006 and of which Brigade no doubt has long been aware.  (*Id.* at 13; Zensky Decl. at ¶¶ 3-7, 9-13, 16-20, 22, 24)  Tellingly, the motion does not point to any facts indicating or even suggesting that the Burtons or other members of the board of directors did anything wrong or breached any duties.  Brigade's motion merely recites publicly available information and then makes unsubstantiated conclusions and fantasizes about back room dealings and wrongdoing that it has no reason to believe actually occurred.

7.      In particular, Brigade attaches as exhibits to its motion Cenveo's proxy statements from 2005 through 2016, which publicly disclose the compensation earned by Cenveo's senior management team as well as related-party transactions.  (*Id.*)  Brigade then couples these public disclosures with news articles, Facebook posts and internet searches showing the Burton family's generosity to certain charitable organizations that are or were associated with other board

members, suggesting that the Burtons tried to use their charitable contributions to secure outsized

compensation. But Brigade's attempt to paint a picture of deceit, conflicts, and lies is full of holes,

mischaracterizations, and factual inaccuracies of which Brigade was aware or could have become

aware had it asked Cenveo simple questions before publicly accusing people of fraud. Brigade's

misstatements and omissions are irresponsible and should be set straight.

8.      As an initial matter, Brigade fails to disclose to the Court that in addition to owning

first and second lien debt, it also owned common stock of Cenveo since at least 2016, according

to public filings. Because Brigade is a sophisticated hedge fund, it must have done at least a

modicum of diligence on Cenveo and reviewed the company's proxy and other public filings prior

to purchasing the stock (and, of course, the debt). Consequently, Brigade must have been aware

of the compensation and related-party transactions that it now claims are "fraudulent" when it

purchased the stock. Indeed, executive compensation and election of the board of directors were

both proposals that Brigade and other shareholders had the opportunity to vote on the Annual

Shareholders Meeting on April 27, 2017. (Zensky Decl. at ¶ 17, Ex. 15)[6]

9.      Brigade's attacks on Dr. Susan Herbst—the President of University of

Connecticut—and Dr. Mark Griffin—the Founder and former headmaster of the Eagle Hill School,

a school dedicated to helping children with learning disabilities to develop academic skills and

self-confidence—are nothing short of egregious. Brigade accuses both Dr. Herbst and Dr. Griffin

of potential "conflicts" and suggests they allowed the Burton family to derive "benefits" from

"insider and related party transactions." (Examiner Mot. at ¶ 13) Brigade's sole basis for these

accusations consists of the fact that the Burton family has historically made charitable donations

---

[6]   The votes were nonbinding and designed to provide the board of directors with Cenveo's shareholders' views.

to institutions with which Dr. Herbst and Dr. Griffin are or were affiliated.[7]  Brigade's attacks on

Dr. Herbst's and Dr. Griffin's character lack any good faith basis and are founded on

misconceptions that even a simple inquiry would have corrected.

10.    So, what are the facts?  Dr. Herbst and Dr. Griffin are both on Cenveo's board,

which, of course, is a matter of public record.  As for the University of Connecticut, the Burton

family has long supported it through charitable giving.  In 1999, Mike Burton, Cenveo's Chief

Operating Officer, graduated from the University of Connecticut, where he was the captain of the

football team.  Brigade points to a $2.5 million gift that the Burton family made to the University

of Connecticut to build a football complex, which was constructed in 2006.    (Zensky Decl. 24)

What does this have to do with Dr. Herbst?  Nothing!  Brigade neglects to mention that Dr. Herbst

did not become affiliated with the University of Connecticut until 2010.  And she did not become

a board member of Cenveo until 2013.

11.    As for the Eagle Hill School, as Exhibits 12, 19, and 21 of Brigade's motion

demonstrate, the Burton family made charitable donations to help build houses for the Eagle Hill

School's teachers so that they could live near the school, and based on two posts from Eagle Hill

School's Facebook page, the Burton family also established the Burton Family Field.  Specifically,

the July 25, 2017 Facebook post stated:  "Thanks to the generosity of the Burton family and other

donors, Eagle Hill has the field of its dreams, not to mention an awesome score board.  Athletes,

see you in the fall!"  What does this have to do with Dr. Griffin?  Nothing!  Dr. Griffin retired as

headmaster in 2009 and is no longer affiliated with the school—other than devoting much of his

life (34 years) to the school and the children.  Both Dr. Herbst and Dr. Griffin deserve better than

---

[7]    It is important to note that the donations referenced in the Examiner Motion were not made by, or on behalf of, Cenveo.

to have their reputations dragged through the mud by an $18 billion hedge fund that is upset with

its potential recovery on account of its second lien holdings in these chapter 11 cases.[8]

12.    Brigade's motion is replete with other factual errors that should also be corrected:

- *First*, Brigade alleges that the 12 percent of the stock that is set aside for the management incentive plan under the RSA will be allocated to Cenveo's insiders. (Examiner Mot. at ¶ 15) The reality is that the management incentive plan will be allocated to 770 employees, including the insiders, and the new board members. (Zameli Decl. ¶ 9) The current Cenveo management team, rather than taking all of the equity for themselves as Brigade incorrectly states, believes that it is important to disperse equity widely for the good of the employees, organization, and shareholders of reorganized Cenveo. (*Id.*)

- *Second*, Brigade alleges that the insiders will make more money than they did prior to chapter 11, citing the fact that Robert G. Burton Sr.'s employment agreement will be amended and assumed. (Examiner Mot. at ¶ 16) In fact, Mr. Burton agreed to take a $250,000 pay cut and reduce his potential bonus from 300 percent of his base salary to 130 percent of his base salary.[9] (Zameli Decl. ¶ 9)

- *Third*, Brigade alleges that Cenveo already agreed to release all parties, including management and the board. (Examiner Mot. at ¶ 17) As the Court and all parties are aware, Cenveo, through its independent director, Eugene Davis, is conducting an independent investigation of potential estate claims. (Zameli Decl. ¶ 9) To the extent any such claims are identified, Mr. Davis will—and has the sole authority to—commence actions, settle claims or release parties, subject to bankruptcy court approval. (*Id.*) Thus, the "Debtor Releases" are subject to Mr. Davis's investigation and not before the Court at this time. (*Id.*)

13.    Brigade had access to all of this information, or could have by simply asking

Cenveo, but chose to proceed in a way aimed at damaging the reputations of the Burton family,

---

[8]    The Burton family has been involved at the Eagle Hill School for many years and made donations when Dr. Griffin was headmaster. In addition, Joe Burton, the son of Robert G. Burton, Sr. is on the board of trustees of Eagle Hill School.

[9]    Brigade is aware of this but made its baseless allegations anyway. The 2017 proxy, which is an exhibit to the Examiner Motion, states on page 42 that Robert G. Burton Sr.'s base salary is $1.5 million and, on page 44 of the proxy, discloses that Robert G. Burton Sr. is eligible for a $4.5 million bonus (*i.e.*, a 300 percent potential bonus). Thus, Brigade is fully aware that rather than making more money after the effective day of a plan of reorganization, Mr. Burton has agreed to be paid substantially less.

Dr. Herbst, and Dr. Griffin.  And to what end?  Brigade made clear its objectives to Cenveo's management and advisors:  Brigade made a bad investment.  Brigade wants more recovery on account of its second lien debt than it is entitled.  Rather than waiting for Cenveo to meet with Brigade and other parties in interest and attempt to broker a deal, Brigade decided to make irresponsible allegations about individuals.  Rather than waiting for Cenveo to file a plan and then objecting to the substance of the plan if Brigade was not satisfied, Brigade decided to go on the attack.

14.    The accusations that Brigade makes in its Examiner Motion are not only unsubstantiated and reckless, but also threaten to destabilize Cenveo's business at this critical juncture.  Vendors and customers are watching closely.  They are fully aware of Cenveo's substantial post-petition liquidity, but they are concerned with the potential implications of Brigade's "burn the house down" tactics.  Regrettably, Brigade seems willing to use any means necessary to implement litigation scare tactics designed to hold up Cenveo's restructuring and extract as much value as possible on behalf of its out-of-the-money second lien position.  Rather than engaging in a destructive smear campaign, Cenveo encourages Brigade to work together, as other stakeholders are doing, on a constructive and value-maximizing reorganization strategy.

15.    In any event, Brigade's request for an examiner is neither necessary nor appropriate, and the attendant costs, expenses, and delay far outweigh the benefit.  As Brigade acknowledges, Cenveo is already conducting an investigation of executive compensation and the related party transactions identified in the Examiner Motion, among other things.  Cenveo's investigation is well underway and is being led by its independent director, Mr. Eugene Davis.[10]

---

[10]    Indeed, Mr. Davis, through Cenveo's professionals, has already conducted multiple interview with board members, management, and employees, as well as reviewed hundreds of pages of documents.

Appointment of an examiner is duplicative of these efforts would constitute an unnecessary drain on Cenveo's resources at a critical juncture of these chapter 11 cases.

16.    Tellingly, Brigade does not—because it cannot—discredit or question Mr. Davis's independence.  Brigade does not claim that Mr. Davis has any relationship with Cenveo or any target or subject of the investigation, because he does not, but rather criticizes the board for appointing any independent director at all.  While Brigade complains that the board "handpicked" Mr. Davis, Brigade identifies nothing wrong with that selection.

17.    Brigade's attack on Cenveo's decision to undertake an independent investigation is baffling for several reasons.  *First*, it is the debtor, as the fiduciary for the estates, that decides to commence actions, settle claims or release parties.  Other parties in interest may only bring claims if they obtain standing from the Bankruptcy Court and can only do so if the court determines that colorable claims exist, that the debtors unreasonably failed to bring the claims, and that bringing the claims is in the best interests of all creditors.  *See In re STN Enterprises*, 779 F.2d 901 (2d Cir. 1985) (holding that to obtain derivative standing, a creditor must satisfy a two-part test:  *first* a creditor presents colorable claims for relief "that on appropriate proof would support a recovery," and second, a creditor demonstrates that the "debtor unjustifiably failed to bring suit").  A debtor needs to investigate potential claims to determine whether claims exist and whether to bring those claims in its duty to maximize the value of its estates.  Thus, Cenveo's decision to appoint an independent director who is well-respected in the industry to lead the investigation was prudent.  *Second*, the momentum for Mr. Davis's appointment accelerated after Cenveo received demands from Brigade—demands to do exactly what it did through the Examiner Motion.  While the board has disclosed compensation and related-party transactions, it also recognized the need for someone

independent to review historical practices.[11]   The board granted Mr. Davis the full and sole authority to investigate all potential claims and determine, subject to Bankruptcy Court approval, whether to commence, settle or release any such claims.  *Third*, as Mr. Davis investigates any and all potential claims, the Committee will as well.  Mr. Davis and Cenveo will cooperate with the Committee to ensure access to information and will consult with the Committee about the results of Cenveo's investigation.  And *fourth*, Mr. Davis will issue a report at the conclusion of his investigation so all parties in interest can review his findings.

18.     Brigade's final attack relates to the negotiation of the RSA and is similarly unfounded and raises issues appropriate for confirmation.  To be clear, Cenveo engaged in comprehensive discussions with Brigade about a potential reorganization plan before the Commencement Date.  (Zameli Decl. ¶ 10)  Cenveo also engaged in discussions and negotiations with the First Lien Noteholder Group.  (*Id.*)  All of the same information was shared with both groups, and the only real difference between term sheets provided by the First Lien Noteholder Group and Brigade related to the value and type of consideration to be provided to the second lien noteholders.  This is all substantiated and public, as Cenveo was required to "cleanse" all of this information to allow Brigade and others to freely trade debt as it desired after the commencement of these chapter 11 cases.

19.     While Cenveo strived to find consensus and compromise between the First Lien Noteholder Group and Brigade, two main facts got in the way.  *First*, Cenveo's view is that the value of the business is less than the amount of the first lien debt and Brigade's allegations that Cenveo's *updated* business plan artificially depressed valuation are incorrect and irrelevant.

---

[11]   Note that, as discussed above, the related party transactions and compensation of executives were publicly disclosed each year in regulatory filings and no shareholder, including Brigade, ever complained of, or asserted, any wrongdoing.

(Zameli Decl. ¶ 11)  *Second*, as the Court is aware, for a plan of reorganization to be confirmed, a non-insider, accepting impaired class must vote in favor of the plan.  (*Id.*)  Because the First Lien Noteholder Group is impaired and holds more than 60 percent of the first lien class, Cenveo decided to move forward with an RSA that the the First Lien Noteholder Group supported. Notably, in connection with Brigade's assertions about the RSA, business plan, and related negotiations, Cenveo voluntarily produced, in response to Brigade's discovery requests, more than 60,000 pages of documents relating to the negotiation of the DIP, the RSA and other issues, in just three weeks' time.  (*Id.*)  Yet Brigade has not pointed to a *single document* to support its theories set forth in its Examiner Motion.

20.      Brigade, of course, could deal with its disagreement with Cenveo over valuation or any other aspect of a proposed plan (which of course, has not yet been filed) in a different way. Brigade could engage in substantive negotiations with Cenveo, as well as the First Lien Noteholder Group and the Committee.  If the negotiations do not result in a global settlement, then Brigade would object to the plan in the normal course.  But rather than pursue this path, Brigade decided to advance a wasteful and unfounded litigation and smear campaign, which undercuts good faith restructuring discussions.

21.      As discussed below, Cenveo recognizes that the Bankruptcy Code may require the appointment of an examiner because the technical requirements of section 1104(c) of the Bankruptcy Code are met.  The circumstances of these chapter 11 cases, however, warrant denial of the Examiner Motion, or at least the adjournment of the motion until the Independent Director completes his investigation and issues his report.  The motion was not filed in good faith, ignores and misstates facts, and is not in the best interests of the estate.  The motion makes irresponsible allegations and includes misstatements of which Brigade would have been aware had it simply

12

asked Cenveo.  If the Bankruptcy Court is compelled to appoint an examiner, the scope should be limited and the cost should be minimal.

**Argument**

22.    The Examiner Motion requests that the Bankruptcy Court appoint an examiner to investigate two categories of issues:  (a) prepetition claims and causes of action against Cenveo's directors and officers related to prepetition compensation, related-party transactions, and certain other matters; and (b) the circumstances surrounding Cenveo's entry into the RSA and the terms of the plan of reorganization contemplated by the RSA.[12]

23.    Setting aside the technical issue of whether the Court is compelled to appoint an examiner in these chapter 11 cases pursuant to section 1104(c)(2) of the Bankruptcy Code, Cenveo respectfully submits, if an examiner is to be appointed, its scope should be extremely limited and/or such appointment should be delayed until Mr. Davis's independent investigation is complete. More specifically, Cenveo's independent director is analyzing potential prepetition claims and causes of action Cenveo may have.  Cenveo has made significant progress on its investigation since the Commencement Date, though additional work remains to complete the investigation before Cenveo may present its report to the Committee and other relevant stakeholders.  Given the involvement of Cenveo, Cenveo submits that the appointment of an examiner will be duplicative and a massive waste of estate resources.

---

[12]    Section 1104(c) of title 11 of the Bankruptcy Code provides two independent grounds upon which a party in interest may move for the appointment of an examiner under two different circumstances.  Section 1104(c) of the Bankruptcy Code specifically provides that "the court shall order the appointment of an examiner to conduct such an investigation of the debtor as is appropriate . . . if," *first*, "the court, in its discretion, decides that such appointment is in the interests of the estate and all of its stakeholders," or, *second*, "the debtor's fixed, liquidated, unsecured debts (other than for goods, services, taxes or owing to an insider) exceed $5 million.  11 U.S.C. § 1104(c).

24.     Nor is there any need for an examiner with respect to Cenveo's entry into the RSA and issues related to confirmation of the plan of reorganization contemplated by the RSA.  More specifically, Cenveo will file a plan of reorganization and disclosure statement and, at that time, parties can provide feedback and file objections.  Consequently, an examination of the plan of reorganization contemplated by the RSA would be premature at this point.

I.    **To the Extent an Examiner is Appointed, The Examiner's Duties Should Be Limited in Scope and Adjourned Until the Independent Investigation is Completed.**

A.    **Brigade's Allegations of "Potential Corporate Fraud, Misconduct and/or Mismanagement" Are Based On Misleading Statements and/or Mischaracterizations of Certain Events Surrounding these Chapter 11 Cases.**

25.     As discussed, the Examiner Motion is replete with conjecture of "potential corporate fraud, misconduct, and/or mismanagement."  (Examiner Mot. at ¶ 24)  Because there is no factual basis for Brigade's request for an examiner, the requested examination should be denied or extremely limited.[13]

26.     Brigade's allegations of "exorbitant" executive compensation and improper "related party transactions" are based solely on Cenveo's regulatory filings.  Shareholders, such as Brigade, were not only aware of the compensation and related party transactions but voted to approve the compensation to be paid to the company's executive officers every year.  The appointment of an Examiner is not warranted under these circumstances.

27.     Brigade's accusations that Dr. Herbst and Dr. Griffin have "conflicts" and are not "independent" directors are similarly baseless.  As explained, there is no indication that the charitable contributions that the Burton family made independent of Cenveo has any bearing on

---

[13]    *See In re GliaTech, Inc.*, 305 B.R. 832, 836 (Bankr. N.D. Ohio 2004) ("A request to appoint an examiner must be substantiated with factual support"; refusing to appoint an examiner in the circumstances presented); *In re Lenihan.* 4 B.R. 209, 210-12 (Bankr. R.I. 1980) (allegations of fraud and theft by debtor, unsupported by evidence, did not justify appointment of examiner); *In re Bel Air Associates,* 4 B.R. 168, 173-74 (Bankr. W.D. Okla. 1980) ("mere naked allegations," without supporting evidence, did not justify appointing examiner).

the company or the decision-making of the board.   Brigade's suggestion that Dr. Herbst and Dr.

Griffin do not qualify as "independent" directors is without foundation.  The Nasdaq Stock Market

Rules define whether an individual qualifies as an independent director:

> "Independent Director" means a person other than an Executive
> Officer or employee of the Company or any other individual having
> a relationship which, in the opinion of the Company's board of
> directors, would interfere with the exercise of independent judgment
> in carrying out the responsibilities of a director. For purposes of this
> rule, "Family Member" means a person's spouse, parents, children
> and siblings, whether by blood, marriage or adoption, or anyone
> residing in such person's home.

*See* Nasdaq Stock Market Rule 5605(a)(2).  Brigade does not allege any circumstances that would

disqualify Dr. Herbst or Dr. Griffin from qualifying as an independent director here.[14]  And there

---

[14]    Under the Rules, a director is not independent if one of the following is satisfied:

> (A) a director who is, or at any time during the past three years was, employed by
> the Company;

> (B) a director who accepted or who has a Family Member who accepted any
> compensation from the Company in excess of $120,000 during any period of
> twelve consecutive months within the three years preceding the determination of
> independence, other than [certain exceptions] . . .

> (C) a director who is a Family Member of an individual who is, or at any time
> during the past three years was, employed by the Company as an Executive
> Officer;

> (D) a director who is, or has a Family Member who is, a partner in, or a controlling
> Shareholder or an Executive Officer of, any organization to which the Company
> made, or from which the Company received, payments for property or services in
> the current or any of the past three fiscal years that exceed 5% of the recipient's
> consolidated gross revenues for that year, or $200,000, whichever is more, other
> than [certain exceptions] . . .

> (E) a director of the Company who is, or has a Family Member who is, employed
> as an Executive Officer of another entity where at any time during the past three
> years any of the Executive Officers of the Company serve on the compensation
> committee of such other entity; or

> (F) a director who is, or has a Family Member who is, a current partner of the
> Company's outside auditor, or was a partner or employee of the Company's
> outside auditor who worked on the Company's audit at any time during any of the
> past three years.

*See* Nasdaq Stock Market Rule 5605(a)(2)(A)-(G).

15

is no indication that Brigade ever objected as a significant Cenveo stockholder to their appointments.  Indeed, at the annual Cenveo meeting of the shareholders, the company would nominate a slate of directors and shareholders would vote.  According to Cenveo's books and records, there is no indication that any shareholders (including Brigade) nominated directors in lieu of Drs. Herbst and/or Griffin.  Because there is no factual basis for Brigade's request for an examiner, the request should be denied or least limited in scope.

> **B.**     **Certain Topics of Requested Examination Are Already the Subject of an Existing Investigation Conducted by an Independent Director.**

28.     Even if Brigade has identified facts that require some level of review, Cenveo in the first instance should be allowed to conclude its ongoing investigation, and the examiner's review should be limited to reviewing the results of that investigation.  Immediately prior to the filing of these chapter 11 cases, Cenveo's board of directors appointed Mr. Davis as an independent director to review potential prepetition claims, including any related to (a) insider or third-party transactions, (b) compensation paid to directors and officers, (c) the nature and extent of the relationship amongst the board members and officers, and (d) any transfers made or obligations incurred by Cenveo that could qualify as an avoidable transfers or obligations, among other things.  The Board delegated to Mr. Davis the full and sole authority to investigate any such claims and determine, subject to court approval, whether to pursue, settle, or release any such claims.

29.     Mr. Davis is an ideal candidate to conduct this investigation because he was not involved in any of these transactions, has no affiliation with any members of the board or any of the insiders (including the Burton family), and had no involvement with Cenveo before his appointment.  Mr. Davis is also an esteemed member of the restructuring community, known for

his independence, who, over the years, has served on many boards of distressed companies.[15]  As such, a qualified, neutral, and respected individual is already overseeing an independent investigation, which is well underway.  The Independent Director will issue a report at the conclusion of his investigation summarizing his findings and will share that report with the Committee and other stakeholders as appropriate.

30.     Moreover, Cenveo has the right, in the reasonable exercise of its business judgment, to pursue, settle, release, abandon, or otherwise resolve any potential colorable claims that are identified in connection with the investigation.  *In re Sabine Oil & Gas Corp.*, 555 B.R. 180, 309 (Bankr. S.D.N.Y. 2016) (concluding that debtor had the right to exercise its business judgment in resolving claims and that debtor's release of certain claims was in the "best interests of the estate").  Brigade does not allege that Cenveo is incapable of evaluating potential causes of action it may possess.

31.     Because Brigade's requested examiner would merely duplicate the work that Cenveo is already performing and would come at the considerable expense of Cenveo's estates and their stakeholders, any examination should not commence until Mr. Davis and the Committee

---

[15]  Mr. Davis is Chairman and Chief Executive Officer of Pirinate Consulting Group, LLC, a privately held consulting firm specializing in turnaround management, merger and acquisition consulting and hostile and friendly takeovers, proxy contests and strategic planning advisory services for domestic and international public and private business entities.  Since forming Pirinate in 1997, Mr. Davis has advised, managed, sold, liquidated and served as a Chief Executive Officer, Chief Restructuring Officer, Director, Committee Chairman and Chairman of the Board of a number of businesses operating in diverse sectors such as telecommunications, automotive, manufacturing, technology, medical technologies, metals, energy, financial services, consumer products and services, import-export, mining and transportation and logistics.  Mr. Davis is or has been a member of the Boards of Directors of numerous companies, including Knology, Inc., DEX One Corp., Atlas Air Worldwide Holdings, Inc., Rural/Metro Corp, Spectrum Brands, Inc., TerreStar Corporation, Delta Airlines, Inc., Haights Cross Communications, Inc., SeraCare Life Sciences Inc., Solutia, Inc., Atari, Inc., Exide Technologies, IPCS, Inc., Knology Broadband, Inc., Oglebay Norton Company, Tipperary Corporation, McLeod Communications, Footstar, Inc., PRG Schultz International, Inc., Silicon Graphics, Inc., Foamex, Inc., Ion Broadcasting, Viskase Companies, Inc., and Media General, Inc.  As a result of these and other professional experiences, Mr. Davis has deep knowledge and experience in the areas of strategic planning, mergers and acquisitions, finance, accounting, restructuring, capital structure and governance.

complete their investigations. *See, e.g., In re Parmalat USA Corp.*, Case No. 04-11139 (RDD) (Bankr. S.D.N.Y. July 26, 2004) [Docket No. 383] (appointing an examiner under section 1104(c)(1) but the appointment was limited to two weeks, the fees were limited to $5,000 and the examiner was allowed to meet with the debtors and the committee to determine if claims were, in fact, being pursued); *In re Asarco, LLC*, Case No. 05-21207 (Bankr. S.D. Tex. Mar. 4, 2008) [Docket No. 7081] (order appointing an examiner, denying the scope of the investigation proposed in the motion, and further providing "that the examiner shall not have any current duties"); *see also In re Erickson Retirement Communities, LLC,* 425 B.R. 312 (Bankr. N.D. Tex. 2010) (noting that to the extent standing and waiver issues did not support the denial of examiner request, the court would appoint an examiner with no duties due to the fact that there was no useful purposes for an examiner even though the $5 million statutory threshold was exceeded).  To the extent any examiner is appointed, her duties should be limited to reviewing the results of the Independent Director's and the Committee's investigations.  For instance, if an examiner needs to be appointed, Cenveo requests that the examiner's role is to review Mr. Davis' report, ask questions to Mr. Davis, and file a short examiner's report.  Cenveo further requests that compensation for the proposed examiner be limited to $10,000.

### C. Allegations Regarding Cenveo's Restructuring Are Inaccurate and, In Any Event, Are Classic Confirmation Issues that Are Inappropriate Subjects for an Examiner's Investigation.

32.    The second group of issues raised in the Examiner Motion relates to Cenveo's entry into the RSA.  Cenveo has not yet filed a plan of reorganization or disclosure statement in these chapter 11 cases.  And the RSA does not require Cenveo to do so until April 3, 2018.  In any event, many of Brigade's allegations are simply incorrect or premature and should be left for confirmation:

| Brigade's Requested Topic for Examination | Why Examiner Investigation Is Inappropriate |
|---|---|
| • **Propriety of negotiation and development of the RSA, the DIP Term Facility, the DIP Term Loan Agreement, or any other restructuring of Cenveo**<br><br>(Examiner Mot. at ¶¶ 1, 14, 34) | • Based on unfounded allegations and mischaracterizations. Brigade has not since identified any factual issue despite Cenveo's production of 60,000+ pages of documents on these topics.<br><br>• Can be raised at confirmation.<br><br>• Can be raised in objection to Cenveo's request to for final DIP financing approval. |
| • **Recoveries to management under the proposed post-emergence management incentive plan as well as any proposed employment agreements to management including the Burton family**<br><br>(Examiner Mot. at ¶¶ 16, 33) | • Based on inaccurate information. Contrary to Brigade's allegations, the equity incentive plan is available to approximately 770 employees, many who are rank-and-file employees, not just insiders. In addition, warrants offered to management will also be offered to new directors.<br><br>• Can be raised at confirmation. |
| • **The proposed releases under the RSA, particularly those to Cenveo's officers, directors, and insiders, including the Burton family**<br><br>(Examiner Mot. at ¶¶ 17, 33) | • Based on inaccurate information. Contrary to Brigade's allegations, the release provisions in the RSA are subject to a fiduciary out and do not preclude Cenveo from pursuing claims. In addition, the proposed restructuring agreement with Brigade contemplated the same releases.<br><br>• Can be raised at confirmation. |
| • **The accuracy and reasonableness of prepetition projections, valuations, financial analyses, statements, business plans, and/or reports upon which the RSA was based as well as any decline in Cenveo's enterprise value and whether corporate acts or omissions contributed to such a decline**<br><br>(Examiner Mot. at ¶ 33) | • Based on unfounded allegations and mischaracterizations. Brigade has not since identified any factual issue despite Cenveo's production of 60,000+ pages of documents on these topics.<br><br>• Can be raised at confirmation. |
| • **The assumption of existing employment agreements with Cenveo's management team.**<br><br>(Examiner Mot. at ¶ 16) | • Based on inaccurate information. Contrary to Brigade's allegations, the senior member of the Burton family has agreed to reduce his compensation.<br><br>• Can be raised at confirmation. |

33.    The Court should not appoint an examiner to delve into Brigade's assertions involving unripe confirmation issues, including valuation and Cenveo's business plan, the management incentive plan, the treatment of employment agreements, debtor releases, or matters relating to the RSA. These are classic confirmation matters on which the Court will undoubtedly make extensive findings following a hearing on the plan of reorganization that Cenveo will ultimately propose. *See, e.g.*, 11 U.S.C. § 1129(a)(7). Granting Brigade's requested appointment

of an examiner to "investigate" these matters would only serve to further its litigation agenda, and

the Bankruptcy Court should, therefore, deny it.  *See, e.g.*, *WorldCom, Inc.*, Case No. 02-13533

(AJG) (Bankr. S.D.N.Y.) [Docket No. 5923] (declining to appoint examiner to look into issues

that were "more appropriately raised in the context of the confirmation process"); *In re Bradlees

Stores, Inc.*, 209 B.R. 36, 40 (Bankr. S.D.N.Y. 1997) (denying motion to appoint examiner and

noting that motion was "nothing more than a litigation/negotiation tactic"); *see also In re Spansion,

Inc.*, 426 B.R. 114, 128 (Bankr. D. Del. 2010) (denying appointment of examiner where the record

"did not provide sufficient evidence of conduct that would make an investigation of the Debtors

'appropriate,' but rather reveal[ed] deep and heated differences of opinion about the value of the

Debtor companies"); *In re Calpine Corp.*, Case No. 05-60200 (BRL) [Docket No. 6467] (Bankr.

S.D.N.Y. 2005) (refusing to appoint examiner, noting that request "smacks more of litigation

leverage than the protection of the unrepresented public as the statute intended"); *see also In re

Visteon Corp.*, Case No. 09-11786 (CSS) (Bankr. D. Del. May 12, 2010) [Docket No. 3159]

(denying appointment of examiner where proposed investigation related primarily to confirmation

issues).

34.     Nonetheless, when eventually Cenveo seeks confirmation of the plan contemplated

by the RSA, Cenveo believes that it will prevail on the issues raised by Brigade and otherwise

demonstrate the confirmability of such a plan at the appropriate time:

- **Valuation**—At the appropriate time, Cenveo will present evidence and testimony establishing an analysis of its assets prepared by Cenveo and its advisors.  Cenveo and its advisors presently believe that any preliminary valuations based upon its current business plan are reasonable in light of projections prepared by Cenveo's management, initial analyses of comparable companies, and the outlook for Cenveo's industry, all of which information will be presented by Cenveo (and subject to challenge by parties in interest) as part of the confirmation process.  Until such time, issue of valuation is not ripe to be examined.

- **Release of Cenveo's Officers and Directors**—Under section 1123 of the Bankruptcy Code, a chapter 11 plan may provide for "the settlement and adjustment of any claim or interest belonging to the debtor or to the estate." 11 U.S.C. § 1123(b)(3)(A).  In reviewing such releases, courts frequently use the standards for approval of a settlement under Rule 9019 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules").[16]  Under Bankruptcy Rule 9019, the Bankruptcy Court may approve a settlement so long as it does not "fall[] below the lowest point in the range of reasonableness[.]"[17]  Assuming that Cenveo's investigation does not reveal any inappropriate behavior or misconduct, Cenveo will demonstrate that the proposed debtor release satisfies this standard and is a reasonable exercise of its sound business judgment.  If, however, Cenveo's investigation does reveal that causes of action exist, Cenveo, in its business judgment, will either settle or pursue such causes of action at that time.

- **Assumption of Existing Employment Agreements**—Under section 1123(b)(2) of the Bankruptcy Code, Cenveo may, in its business judgment assume or reject certain executory contracts or unexpired leases in the context of a plan. 11 U.S.C. § 1123(b)(2).  In reviewing such contracts, Cenveo will exercise its business judgment based on the circumstances of these cases.  Cenveo will be prepared to demonstrate that the proposed assumption of employment contracts will benefit the estates because the management team are the individuals who understand this company and have the relationships with customers and vendors.[18]

- **Management Incentive Plan**—Cenveo has also agreed to provide for a management incentive plan that provides for the issuance of (a) restricted stock units exercisable for up to 3.0% of the reorganized company and (b) stock options, stock appreciation rights and other similar appreciation awards exercisable for up to 9.0% of the reorganized company to *management, key employees and directors of the reorganized company*.  *See* RSA, Ex. A, at 8 (emphasis added).  Not only are these distributions standard in the industry (and in chapter 11 restructurings, generally), but this incentive plan in particular is meant to assure that Cenveo succeeds upon exit by incentivizing key individuals to out-perform and create value for the company after it emerges.  In an off-the-cuff allegation, Brigade states that this incentive plan is "substantial" based on

---

[16] *See e.g.*, *In re Bally Total Fitness of Greater N.Y., Inc.*, 2007 WL 2779438, at *12 (Bankr. S.D.N.Y. Sept. 17, 2007) ("To the extent that a release or other provision in the Plan constitutes a compromise of a controversy, this Confirmation Order shall constitute an order under Bankruptcy Rule 9019 approving such compromise."); *In re Spiegel Inc.*, 2005 WL 1278094, at *11 (Bankr. S.D.N.Y. May 25, 2005) (approving releases pursuant to section 1123(b)(3) and Bankruptcy Rule 9019(a)).

[17] *Cosoff v. Rodman (In re W.T. Grant Co.)*, 699 F.2d 599, 608 (2d Cir. 1983), *cert. denied*, 464 U.S. 822 (1983) (*citing Newman v. Stein*, 464 F.2d 689, 693 (2d Cir. 1972)).

[18] Moreover, the Examiner Motion conveniently omits that Mr. Robert G. Burton, Sr. has already agreed to significantly reduce his compensation, bonus, and severance.  *See* RSA, Ex. A, at 7.

21

a low valuation that is inconsistent with prior public disclosures. (Examiner Mot. at ¶ 1)  Again, valuation will be argued and decided at a later stage and requesting that an examiner intervene at this time to examine the management incentive plan is premature.

- **Other Confirmation Issues**—Cenveo will demonstrate that any proposed plan satisfies all of the standards set forth in section 1129, including the requirement of good faith under section 1129(a)(3).

35.    After a thorough examination and analysis of the relevant legal and factual issues, Cenveo decided to enter into the RSA with the First Lien Noteholder Group because it provides the best means of maximizing the value of Cenveo's estates and the least disruption to Cenveo's business.  Further, the RSA contains a "fiduciary out" that permits Cenveo and its directors and officers to take any action that is consistent with its fiduciary obligations under applicable law.[19] (Zameli Decl. ¶ 12)  The terms of the RSA were the product of hard-fought negotiations and entry into the RSA was authorized by Cenveo's board of directors after appropriately considering various alternatives.  (*Id.*)  Like many of the other issues raised in the Examiner Motion, Brigade is free to object to, and litigate (rather than negotiate), Cenveo's ability to confirm a plan that is premised upon the RSA.  Brigade should not, however, be permitted to further deplete scarce estate resources to fund its attempted litigation agenda, especially so early in these cases and particularly to address confirmation issues prematurely.

---

[19]    *See* Section 5(b)(iv) of the RSA, which allows Cenveo to terminate the agreement if:  "the board of directors of Cenveo determines in good faith, and after consultation with outside counsel, that continued support for the Restructuring and performance under this Agreement would be inconsistent with the exercise of its fiduciary duties under applicable Law."

WHEREFORE, the Debtors respectfully request that the Bankruptcy Court deny the

Examiner Motion in its entirety and grant such other further relief as is just and proper.

Dated: February 27, 2018          */s/ Jonathan S. Henes, P.C.*
New York, New York                 Jonathan S. Henes, P.C.
                                   Joshua A. Sussberg, P.C.
                                   George Klidonas
                                   Natasha Hwangpo
                                   **KIRKLAND & ELLIS LLP**
                                   **KIRKLAND & ELLIS INTERNATIONAL LLP**
                                   601 Lexington Avenue
                                   New York, New York 10022
                                   Telephone:     (212) 446-4800
                                   Facsimile:     (212) 446-4900

                                   - and -

                                   James H.M. Sprayregen, P.C.
                                   A. Katrine Jakola, P.C. (admitted *pro hac vice*)
                                   Christina Lynn Briesacher (admitted *pro hac vice*)
                                   Melissa N. Koss
                                   Gregory F. Pesce (admitted *pro hac vice*)
                                   **KIRKLAND & ELLIS LLP**
                                   **KIRKLAND & ELLIS INTERNATIONAL LLP**
                                   300 North LaSalle Street
                                   Chicago, Illinois 60654
                                   Telephone:     (312) 862-2000
                                   Facsimile:     (312) 862-2200

                                   *Proposed Counsel to Cenveo, Inc., et al.*